[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-15767

_____

D.C. Docket No. 3:14-cr-00147-JDW-TFM-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

ANTONIO DARSET KING, SR.,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(October 25, 2018)

Before WILLIAM PRYOR and MARTIN, Circuit Judges, and VRATIL,[*] District

Judge.

MARTIN, Circuit Judge:

_____

[*] Honorable Kathryn H. Vratil, United States District Judge for the District of Kansas, sitting by designation.

Antonio Darset King, Sr., appeals his conviction on three federal firearms and drug-related charges. He challenges the District Court's denial of his motion to suppress evidence and his attorney's failure to fully litigate his suppression claim, among other issues. After careful consideration and with the benefit of oral argument, we affirm.

**I.**

On February 19, 2014, a pastor for the New Hope Baptist Church in Cottonton, Alabama, discovered a dead body in the grass next to the church parking lot. The victim was Sayquawn Wiggins, Mr. King's nephew. Officers from the Russell County Sheriff's Department quickly determined Mr. Wiggins had been murdered and opened a homicide investigation.

Over the course of the next few days, Lieutenant Harold Smith spoke with a number of Mr. Wiggins's and Mr. King's family members and others. From these conversations, Lt. Smith learned there had been a dispute between Mr. Wiggins and Mr. King over money and drugs, and Mr. King had threatened to kill Mr. Wiggins as a result. Lt. Smith also gleaned Mr. King's uncle, Santago Montrell Davis, stayed with Mr. Wiggins at an inn the night before Mr. Wiggins was killed. Based on this information, Lt. Smith called Mr. Davis and his wife on February 21, 2014 to the sheriff's office for questioning.

2

Mr. Davis and his wife initially presented two very different stories of what took place the day Mr. Wiggins died.  Mrs. Davis said she had received a call from her husband to pick him up.  When she arrived, she found him panicked and distraught.  He told her a group of men stopped him and Mr. Wiggins and took Mr. Wiggins away by gunpoint.  In contrast, Mr. Davis initially denied to Lt. Smith he was with Mr. Wiggins the day he died, as well as the night before.  Faced with this inconsistency, Lt. Smith allowed Mrs. Davis to speak with her husband in the interview room.  Following their conversation, Mr. Davis admitted to Lt. Smith he was with Mr. Wiggins both days.  Mr. Davis also said a group of men stopped him and Mr. Wiggins at gunpoint and took Mr. Wiggins away.  Both Mr. and Mrs. Davis expressed fear that Mr. King would find and kill them.  As a result, the officers booked a hotel for the couple for the evening.

The next day, Lt. Smith interviewed Mr. Davis again.  Mr. Davis stuck to the same story, but added that Mr. King reached out to him before Mr. Wiggins's death and gave him an ultimatum: either help King kill Wiggins or King would kill Davis and his family.  Mr. Davis then said he agreed to help Mr. King find Mr. Wiggins.  Officers subsequently arrested Mr. Davis as a murder suspect.[1]

On February 23, 2014, Lt. Smith prepared an affidavit for a warrant to search Mr. King's residence.  His affidavit relied on statements from Mr. Davis and Mr.

---

[1] Two months later, Mr. Davis admitted to shooting and killing Mr. Wiggins.  He also told the officers where to find the murder weapon.

3

King's family members, as well as evidence indicating both Davis and King had been within 1.5 miles of the crime scene around the time Mr. Wiggins died. The affidavit set out Lt. Smith's belief that Mr. King's home contained evidence linking King to Mr. Wiggins's murder. The affidavit did not detail Mr. Davis's various inconsistent stories. A judge approved the search warrant, and officers executed it that same day. However, the search did not yield the expected evidence of murder. Instead officers found evidence of a drug trafficking operation: a Glock pistol wedged underneath a mattress in the master bedroom, a razor blade with a white, powdery substance on it, $2,760 in cash, and a plastic bag containing a "compressed white substance" believed to be cocaine. The officers also discovered $512 on Mr. King after arresting him.

Federal prosecutors charged Mr. King with (1) possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g) and 924(e)(1); (2) possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1); and (3) possession of a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i). The Magistrate Judge appointed two federal defenders to represent Mr. King. Shortly after their appointment, they filed a motion to suppress all evidence stemming from the search warrant. Counsel argued Lieutenant Harold Smith of the Russell County Sheriff's Department omitted critical information from his affidavit in support of the search warrant.

4

Counsel contended these omissions warranted application of the exclusionary rule

under United States v. Leon, 468 U.S. 897, 104 S. Ct. 3405 (1984), because the

warrant had been prepared with a reckless or knowing disregard for the truth.

The Magistrate Judge held a suppression hearing.  Lt. Smith was the only

witness.  Dan Hamm, Mr. King's new trial counsel, cross-examined Lt. Smith.[2]

Lt. Smith admitted on cross-examination that Mr. Davis did not mention Mr.

King's threats until after Lt. Smith had already alluded to their existence based on

his interview with Mrs. Davis.  Lt. Smith also conceded portions of Mr. Davis's

statements to him "were not true" in hindsight, but emphasized he based his

affidavit on the threats Mr. King made against Davis's family, including Mr.

Wiggins.

The Magistrate Judge credited Lt. Smith's testimony and recommended the

District Court deny Mr. King's motion to suppress.  The Magistrate Judge

reasoned even without the inclusion of Mr. Davis's statements, there was probable

cause to support the search warrant.  The District Court adopted the Magistrate

---

[2] Mr. King's federal defenders both withdrew from their representation of Mr. King, citing an irrevocable breakdown in the attorney-client relationship.  The Magistrate Judge then appointed new counsel for Mr. King.  Soon, Mr. King sent several letters to the District Court expressing dissatisfaction with his new attorney.  Mr. King also filed a bar complaint against newly appointed counsel.  As a result, the Magistrate Judge appointed Mr. Hamm as lead counsel.  Mr. Hamm was later discharged for health reasons.

Judge's report and recommendation,[3] and denied the motion to suppress.  The District Court relied on slightly different reasoning than the Magistrate Judge.  The District Court found the affidavit was not sufficient to support the search warrant in the event Mr. Davis's statements were removed.  Nonetheless, the District Court denied Mr. King's motion to suppress, because he had failed to make a substantial preliminary showing that Lt. Smith either knowingly or with a reckless disregard for the truth included false statements in his affidavit in support of the search warrant.

On December 14, 2015, Mr. King moved pro se for the District Court to appoint new counsel because his most recently appointed attorney had yet to visit him in person, although her associate of four years had.  By this point, the Magistrate Judge and the District Court had appointed a total of five attorneys for Mr. King, each of whom failed to satisfy Mr. King's expectations.  In addition, the District Court had warned Mr. King it would not entertain additional appointments "absent some clear indication that that attorney should be relieved" and that "[m]ere disagreement" between Mr. King and his counsel would be insufficient.  The District Court denied Mr. King's request to appoint new counsel.  The District Court then asked Mr. King to choose between proceeding with his currently

---

[3] The Magistrate Judge supplemented his first report and recommendation to address Leon and Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674 (1978), in response to Mr. King's objections.  The District Court reviewed both reports and recommendations in its order denying Mr. King's motion to suppress.

6

appointed counsel or proceeding pro se.  Mr. King replied that the court could do "whatever [it] please[d]," but he would not allow current counsel to represent him.

As part of the ensuing pro se colloquy, the District Court explained in great detail each of the three charges Mr. King faced, including the maximum possible penalties and forfeitures for each if Mr. King were convicted.  The District Court further explained to Mr. King that if he elected to represent himself, he would be on his own and would not be able to receive any advice from the court.  The District Court warned Mr. King it was "unwise for [him] to try to represent [himself]" and a "trained lawyer would defend [him] far better than [he] could defend [himself]."  Mr. King replied that although he didn't want to represent himself, he would not allow current counsel to represent him.  The District Court made a finding that Mr. King had agreed to represent himself.  The District Court appointed current counsel as standby counsel.

Mr. King filed a pro se motion for reconsideration of the motion to suppress and requested a second suppression hearing.  The Magistrate Judge granted Mr. King's motion for a second suppression hearing.  Lt. Smith testified again about his investigative steps.  After this hearing, the Magistrate Judge issued a report and recommendation recommending Mr. King's motion to suppress be denied for the same reasons expressed in the District Court's prior order.  The District Court

adopted the Magistrate Judge's report and recommendation and denied Mr. King's motion to suppress.

Mr. King's case then proceeded to trial. At the close of the government's case, standby counsel for Mr. King moved on his behalf for a judgment of acquittal. Counsel argued the government failed to demonstrate a connection between the gun found in Mr. King's home and the drugs discovered as part of the same search. She also argued there was insufficient evidence showing Mr. King intended to distribute any drugs. The District Court denied the motion.

The jury convicted Mr. King on all three counts. The District Court denied Mr. King's pro se motion for a new trial and sentenced him to 300 months in prison.

Mr. King timely appealed.

## II.

A district court's ruling on a defendant's motion to suppress presents a mixed question of law and fact. United States v. Ramos, 12 F.3d 1019, 1022 (11th Cir. 1994). We therefore review de novo the district court's application of the law, and its factual findings for clear error. Id. We review de novo both a defendant's waiver of his right to counsel and a district court's denial of a motion for judgment of acquittal. United States v. Garey, 540 F.3d 1253, 1268 (11th Cir. 2008) (en banc); United States v. Pistone, 177 F.3d 957, 958 (11th Cir. 1999) (per curiam).

8

"We review for abuse of discretion the denial of a motion for a new trial." United States v. Brester, 786 F.3d 1335, 1338 (11th Cir. 2015).

### III.

Mr. King raises five issues on appeal: (1) whether the District Court should have granted his motion to suppress; (2) whether Mr. Hamm rendered ineffective assistance of counsel for failing to litigate the suppression claim; (3) whether King knowingly and voluntarily waived his right to counsel; (4) whether the District Court should have granted his motion for judgment of acquittal; and (5) whether the District Court should have granted the motion for a new trial. Because the District Court has not yet had the opportunity to assess Mr. King's ineffective assistance claim and the factual record has not been developed, we dismiss this claim without prejudice. See, e.g., United States v. Khoury, 901 F.2d 948, 969 (11th Cir. 1990). We address the remaining four issues in turn.

### A.

Mr. King first argues the District Court should have suppressed the evidence seized from his home because Lt. Smith's search warrant affidavit included information he knew was false at the time and omitted material details.

An affidavit supporting a search warrant is presumptively valid. See Franks 438 U.S. at 171, 98 S. Ct. at 2684. It is therefore the defendant's burden to prove the affiant withheld material statements from or included false statements in the

9

affidavit either purposefully or with a reckless disregard for the truth.  See United States v. Kapordelis, 569 F.3d 1291, 1309 (11th Cir. 2009).  Only upon a successful showing will the court apply the exclusionary rule and suppress evidence obtained in reliance on a "knowing or reckless falsity of the affidavit." Leon, 468 U.S. at 914, 104 S. Ct. at 3416.  "If, however, probable cause still exists once the false statement is removed from [or the omission included in] the warrant," the evidence may not be suppressed.  United States v. Gamory, 635 F.3d 480, 490 (11th Cir. 2011); see also Kapordelis, 569 F.3d at 1309 ("[E]ven intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause." (alteration in original) (quotation marks omitted)).

The District Court correctly ruled that Mr. King failed to make the required showing.  The record includes no evidence that Lt. Smith intentionally or recklessly produced a misleading affidavit in support of his application for a search warrant.  At the time he wrote the affidavit, Lt. Smith had heard from a number of witnesses, including Mr. Davis, that Mr. King threatened Mr. Wiggins's life over the last few months.  It matters not that Lt. Smith did not include exactly when each of those threats was made.  See Madiwale v. Savaiko, 117 F.3d 1321, 1327 (11th Cir. 1997) ("Omissions that are . . . insignificant and immaterial[] will not invalidate a warrant.").

10

Neither is there evidence supporting Mr. King's contention that Lt. Smith recklessly omitted Mr. Davis's earlier, inconsistent statements from the affidavit. Based on Mr. Davis's answers, Lt. Smith thought Mr. Davis initially provided inconsistent statements out of fear of retaliation by Mr. King. He therefore allowed Mrs. Davis to speak with Mr. Davis to assuage any fears Mr. Davis might have had about answering truthfully. Afterwards, Lt. Smith included in his affidavit only the information he thought accurate. He testified that he omitted Mr. Davis's earlier inconsistent narratives from the affidavit because he thought they were false. He further testified he did not suggest Mr. Davis implicate Mr. King in the murder. At most, Lt. Smith "kind of alluded" to the possibility Mr. Davis was not being entirely truthful because he was afraid of Mr. King. He did so because Mrs. Davis had already informed Lt. Smith her husband was afraid of Mr. King and would withhold the truth based on that fear. The District Court found Lt. Smith credible. In contrast, Mr. King's argument that Lt. Smith purposefully manipulated his interview with Mr. Davis to implicate Mr. King is speculative at best. On this record, the District Court did not err when it denied Mr. King's motion to suppress.

## B.

Mr. King next argues he was denied his Sixth Amendment right to counsel because he did not knowingly and willingly waive his right to counsel. This

11

argument is without merit.  As we recognized in Garey, "it is possible for a valid waiver of counsel to occur not only when a cooperative defendant affirmatively invokes his right to self-representation, but also when an uncooperative defendant rejects the only counsel to which he is constitutionally entitled," as long as he understands "his only alternative is self-representation with its many attendant dangers."  540 F.3d at 1265.  The District Court thoroughly walked Mr. King through his choices, which were to either proceed with his fifth appointed counsel, or represent himself.   Mr. King repeatedly informed the District Court he would let it "do whatever" as long as he didn't have to "go with" current counsel.  Mr. King adhered to this position even after the District Court explained the consequences of a conviction and the dangers of self-representation, which Mr. King indicated he understood.  Mr. King reluctantly accepted that he would have to defend himself because he did not wish to be represented by current counsel.

The record reflects Mr. King fully understood the choices before him, knew the potential dangers of proceeding pro se, and rejected counsel's assistance regardless.  See Garey, 540 F.3d at 1267.  Under these circumstances, the District Court did not violate Mr. King's right to counsel by permitting him to represent himself.

Mr. King nonetheless urges us to conclude his waiver was invalid because the District Court did not inquire into whether good cause existed to appoint new

counsel.  The record belies this argument.  The District Court asked Mr. King twice why he desired new counsel.  Mr. King explained he was upset because in his view, counsel failed to correctly file her motions and had yet to see him in-person.  When asked whether he had any additional grievances, Mr. King said he did not.  Counsel rebutted Mr. King's claims and explained that although she had not personally visited Mr. King, her associate of four years had.  Only after inquiring into Mr. King's reasons for seeking new counsel did the District Court deny his request for failure to show good cause.  This was sufficient.  See United States v. Jimenez-Autunez, 820 F.3d 1267, 1271 (11th Cir. 2016) ("Good cause exists where there is a fundamental problem, such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an apparently unjust verdict." (quotation marks omitted)).

## C.

Mr. King also challenges the District Court's denial of his motion for judgment of acquittal.  He claims "pertinent discrepancies" in the government's evidence meant no reasonable trier of fact could find the evidence established guilt beyond a reasonable doubt.  This argument fails.

Although two of the officers offered different reports about where they found the bag of cocaine in Mr. King's home, one of the officers clarified on direct examination that his report mistakenly listed the location of discovery as the

13

master bedroom when it was the secondary bedroom. A photograph showing the drugs in the second bedroom corroborated the officer's testimony. A reasonable factfinder could find from this there was no discrepancy in the officers' testimony. A reasonable factfinder could similarly find no discrepancy between the officers' testimony they had found $3,300 and $2,760 from Mr. King's home. After all, the officers ultimately recovered nearly $3,300 in total, $2,760 from Mr. King's house and $514 from Mr. King's person. That the officers provided one number or the other in these circumstances does not throw into question the ability of the government to prove its case beyond a reasonable doubt. We therefore conclude the District Court did not err when it denied Mr. King's motion for a judgment of acquittal. See United States v. Descent, 292 F.3d 703, 706 (11th Cir. 2002) (per curiam) (explaining "we view the facts and draw all inferences in the light most favorable to the Government" when reviewing the District Court's denial of a motion for judgment of acquittal).

### D.

Last, we reject Mr. King's argument he was entitled to a new trial based on juror bias. Mr. King provided no evidence that one of the jurors was related to the mother of King's children or was acquainted with his sister, the mother of Mr. Wiggins. As a result, there is no evidence the juror lied when she informed the District Court during voir dire that she did not know him. Without such evidence,

14

Mr. King cannot establish the juror knowingly made a dishonest statement.  <u>See</u>

<u>United States v. Quilca-Carpio</u>, 118 F.3d 719, 722 (11th Cir. 1997) (per curiam).

As a result, he cannot satisfy the requirements for a new trial.  <u>See</u> <u>McDonough</u>

<u>Power Equip., Inc. v. Greenwood</u>, 464 U.S. 548, 556, 104 S. Ct. 845, 850 (1984).

   **AFFIRMED.**